## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **MARGO BATTLE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | **Case No.  09-CV-106-TCK-FHM** |
| **J-M MANUFACTURING COMPANY, INC.,** | ) | |
| **d/b/a JM EAGLE,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### OPINION AND ORDER

Before the Court is Defendant's Motion for Summary Judgment (Doc. 38).

## I.     Factual Background[1]

Defendant J-M Manufacturing Company d/b/a JM Eagle ("JM Eagle") manufactures polyvinyl chloride and polyethylene pipe at a facility in Tulsa, Oklahoma.  Currently, JM Eagle's Tulsa facility is divided into two adjacent plants – (1) the pipe plant, at which employees manufacture pipe, and (2) the fittings plant, at which employees manufacture, modify, assemble, and package pipe fittings.  The fittings plant has two departments – moldings and secondary.  In April 2006, JM Eagle hired Plaintiff Margo Battle, an African-American female, to work in the secondary department of the fittings plant at the rate of $8.50 per hour.

At the time Plaintiff was hired and trained, the fittings department was located in Shawnee, Oklahoma.  In June 2006, JM Eagle moved the fittings department to Tulsa.  Upon her initial hire, Plaintiff was trained in three areas of the secondary department of the fittings plant – drill press, high volume drill press, and assembly.  Plaintiff's supervisors were Craig Kerr ("Kerr") and an individual

---

[1] The following facts are not disputed or construed in a light most favorable to Plaintiff.

named Ray ("Ray").[2]  Sometime between April and June 2006, while Plaintiff was working in Shawnee, Plaintiff met with Kerr and Ray and complained about discriminatory treatment of minorities ("Spring 2006 Complaint").  According to Plaintiff, she complained that whites were taking long smoke breaks and long lunch hours, "leaving minorities in positions to do – to push all the work that was mandatory to get out at the time."  (Battle Dep., Ex. 1 to Pl.'s Resp. to Def.'s Mot. for Summ. J., at 67.)  In response, Ray got angry, told her she would be fired if she brought up discrimination again, and used profanity.

By June 2006, when the facility moved from Shawnee to Tulsa, Plaintiff had been trained in three areas: (1) drill press, (2) high volume drill press, and (3) assembly line. Her specific duties were running drill press and high volume drill press.  At this time, JM Eagle sent four employees to an outside training class at Tulsa Technology Center to be trained on two machines:  (1) the horizontal CNC machine ("CNC"); and (2) the SH-50 machine ("SH-50").  These four employees were Dale Dunn ("Dunn"), Annie Dunn, Stephanie Carr ("Carr"), and Josh Cadell ("Cadell"), all of whom were white.  Plaintiff was subsequently trained on CNC and/or SH-50 by Carr.[3]  Sometime around September or October 2006, Plaintiff began working on SH-50 and trained at least one other individual on SH-50.  From June 2006 to December 2006, Plaintiff's supervisors were Kerr and Cadell, who replaced Ray as lead.  During the period of June to December 2006, Plaintiff received two fifty-cent per hour raises, reaching the pay rate of $9.50 per hour.  Sometime prior to October

---

[2]  The record is unclear as to Ray's last name.

[3] The record is not clear as to the precise machine for which Plaintiff received training. For purposes of this motion, the Court assumes that Plaintiff was trained on both machines.

2006, Plaintiff made a complaint to Kerr and Darren Warn ("Warn"), plant manager, regarding racially inappropriate comments made by her co-worker, Dunn ("Fall 2006 Complaint").

On January 4, 2007, Plaintiff became an inspector in the Quality Assurance Department. Plaintiff's supervisor at this time was Charles Boyer ("Boyer"). While working as an inspector, Plaintiff received two additional raises, bringing her pay rate to $10.30 per hour. While working as an inspector, Plaintiff complained to Boyer regarding a racial comment made by co-worker Troy Peck ("Peck") ("January 2007 Complaint"). Plaintiff also alleges that Boyer made a comment that, if they lived in prior times, he would be the master and she would be the slave.

On March 22, 2007, Plaintiff filed a work-related injury report, in which she claimed to have injured her right arm due to the repetitive lifting of boxes. After being evaluated that same day at Concentra Medical Centers ("Concentra"), JM Eagle's selected workers' compensation medical facility, Plaintiff was released to return to work with a restriction barring her from repetitive lifting, pushing, or pulling of items weighing over five pounds ("temporary restriction"). On April 4, 2007, following a subsequent visit to Concentra, Plaintiff's temporary restriction was modified to prohibit repetitive lifting, pushing, or pulling of items weighing over two pounds. On April 6, 2007, Plaintiff filed a workers' compensation claim in connection with the injury to her right arm. On May 23, 2007, Plaintiff underwent surgery on her right elbow and was placed on leave.

It is undisputed that, prior to her surgery, Plaintiff had been offered promotions to lead positions on the second and third shifts, although Plaintiff never worked these shifts. Plaintiff was never offered promotions to lead positions on the first shift and, on three occasions when Plaintiff alleges to have been eligible for such promotions, white employees were promoted instead of her.

From March 22, 2007 until her surgery on May 23, 2007, JM Eagle maintained Plaintiff in the same position of inspector, which involved repetitive lifting of boxes. However, as a modification of the inspector position, JM Eagle assigned her a "helper" and instructed Plaintiff to allow her helper to lift the boxes. Toward the beginning of this period, Boyer witnessed Plaintiff violating her restrictions by lifting boxes and informed Warn. Warn discussed these violations with Plaintiff. Plaintiff explained to Warn that the "helpers" were too slow to arrive and that she was concerned about not keeping up with production. After Warn discussed this with her, she did not continue to violate her restrictions and waited for her helper to lift the boxes.

On September 19, 2007, approximately five months after the surgery on her right arm, Plaintiff was released from care with permanent medical restrictions barring Plaintiff from lifting, pushing, or pulling items over twenty-eight pounds and from repetitively lifting over five pounds ("permanent restrictions"). Upon Plaintiff's return to work, Warn determined that there was not an available position that would accommodate Plaintiff's permanent restrictions. Warn decided, however, to modify an available position within the moldings department of the fittings plant to accommodate Plaintiff's permanent restrictions. Typically, employees in the moldings department rotate machines every day or every half-day. This rotation includes working on a machine known as the Metfit #1 machine ("Metfit 1"). To operate Metfit 1, one must generally open a door on the machine, insert a piece of material weighing up to two pounds, close the door, wait for the machine to mold the part, and then remove the part. The moldings department rotation also includes some type of assembly area known as the "back table," as well as approximately eight other machines. Warn modified the available position in the moldings department by requiring Plaintiff to work solely on Metfit 1, with no rotation. Warn informed Plaintiff that this modified position was the only one available to accommodate her permanent restrictions, and Plaintiff agreed to work in this

4

position.  Thus, Metfit 1 was taken out of rotation, and Plaintiff became its sole operator.  At all relevant times, all employees in moldings, including other African-American employees, were allowed to rotate.  Mark Heatherly ("Heatherly") supervised the moldings department.  LaDaryl Barnes ("Barnes"), an African-American male who was hired at the same time as Plaintiff, was the department lead.

On October 23, 2007, Plaintiff paged a co-worker to assist her with Metfit 1.  Heatherly thought she did so in an inappropriate manner and he screamed at Plaintiff, igniting a heated exchange between the two ("10/23/07 incident").  Plaintiff complained about this incident to Warn but did not mention race or discrimination.  ("October 2007 Complaint").

With respect to her operation of Metfit 1, Plaintiff testified that, due to the positioning of the machine, she could only open and close the door with her left hand.[4]  At some point prior to December 13, 2007,[5] Plaintiff complained to Barnes that her left side was stiffening and that she desired to rotate to other duties to help ease pains and muscle spasms on the left side of her body. Barnes talked to Heatherly, who indicated that Plaintiff must stay on Metfit 1.  Plaintiff then complained directly to Warn and described this conversation as follows:

> I had informed [Warn] about how the machine was making me stiff and that as long as I had been on the job, even being a quality control inspector, nobody stayed there over half a day because of that reason, getting muscle spasms and everything.  And that when the machine broke down, that I was able to rotate to the back tables, where half an inch, an inch . . . parts were being ran . . . and how come I couldn't rotate. And [Warn] informed me that he would talk to [Heatherly] about it.  But when I went back down there, I was still placed in the same position.

---

[4]  Plaintiff is left-handed.  Plaintiff contends that she did not open the door with her right hand simply because the machine's positioning made it impossible to do so, not because of her left-handedness or her injury.

[5]  It appears this complaint and ensuing conversation with Warn took place on December 12, 2007, although the Court finds the record unclear in this regard.

(Battle Dep. at 155.)  Upon arriving for her shift on the morning of December 13, 2007, Plaintiff asked Barnes where she would be working that day.  Barnes told her he had to put her on Metfit 1. Plaintiff told him she could barely turn her neck, was having muscle spasms in her neck, and could not operate Metfit 1 for any length of time that day.  Plaintiff asked Barnes to accompany her to speak to Heatherly.

Plaintiff, Barnes, and Heatherly then met in Heatherly's office.  Plaintiff explained to Heatherly that, to her understanding, Warn would allow her to rotate within her restrictions. Heatherly then called Warn, Warn was placed on speaker phone, and Heatherly explained the situation to Warn.  In her deposition, Plaintiff described Warn's reaction to her request to rotate:

> And when I went to go talk, [Warn] stopped me and said . . . I can't do anything for you.  You need to go back to workmen's comp and get the restriction took off you. And I said, I am not complaining about my right arm, my pre-existing injury.  I'm asking can I be rotated when the machines is down, broke down, you let – you're allowed to rotate, so can I please rotate until this stiffness just go out my neck.  And he said, I can't do anything for you.  I tell you what, you clock out, you go call workmen's comp and get the restrictions off you.  When you get the restrictions off you, then you call me.  So I couldn't understand why I was being sent home like that.

(Battle Dep. at 165.)  Plaintiff left the facility that morning.  In her affidavit, Plaintiff further explained that Warn's refusal to allow her to rotate "made little sense" because "Warn would allow [her] to work at the back table when the Metfit machine was broken or being repaired."  (Barnes Aff., Ex. 3 to Pl.'s Resp. to Def.'s Mot. for Summ. J., at ¶ 5.)

The next day, on December 14, 2007, Plaintiff visited her own doctor.  Notes from this visit indicate that Plaintiff complained of neck pain and body pain on the left side.  Such notes further state:

> She reports her company moved her to a different position and this position has a lot of repetitive motion w/ her left arm and she has developed a large amount of pain in the left side of her neck posteriorly as well as upper trapezius pain and also having muscle spasms in this area.  She has reported this to her work, but she states they

don't know when she will be able to 'see the worker's comp physician.' She has also reported over the last week and a half a weight loss of 10lbs. She is unsure if this might be due to her thyroid or stress. She does not have much of an appetite.

(Ex. 7 to Pl.'s Resp. to Def.'s Mot. for Summ. J.)

Following this December 14, 2007 visit, Plaintiff called Judy Hamilton ("Hamilton"), a member of JM Eagle's human resources department, to inform Hamilton that she had seen her doctor and that she was ready to return to work. Hamilton told Plaintiff that she could not return to work without Warn's approval and that Warn was out of town. Plaintiff called the plant nearly every day trying to reach Warn. When she finally reached Warn, she informed him that the individual he instructed her to speak with at workers' compensation would be out until December 27 and that she desperately needed to return to work in order to feed her children. According to Plaintiff, Warn told her that she needed to talk to "workmen's comp" and "get the restrictions lifted." In Plaintiff's view, she was not being allowed to return to work. Plaintiff never informed Warn or Heatherly that she was willing to return to work to operate Metfit 1. Plaintiff stopped receiving her paycheck.

Sometime after December 13, 2007, Plaintiff applied for unemployment compensation benefits with the Oklahoma Employment Security Commission ("OESC") and indicated that she had been discharged from employment. On or around December 27, 2007, JM Eagle received notice that Plaintiff had applied for unemployment compensation. On December 28, 2007, Warn wrote a letter to OESC disputing Plaintiff's receipt of unemployment benefits:

> JM Eagle is disputing the unemployment benefits claim for Ms. Margo Battle. She was not discharged, terminated, or fired from her job at JM Eagle. Ms. Battle returned to work from a workers comp claim with restrictions. JM Eagle provided Ms. Battle a job to accommodate her restrictions. She worked at her new position for approximately 30 days when she indicated she wanted to transfer to another position. Ms. Battle was reminded we could not move her to another position due to her restrictions and that we would have to have her doctor issue a release without restrictions before we could put her in for a transfer. On December 13th, 2007, Ms. Battle requested time off to go see her doctor about her restrictions. We received a

7

> call from our workers comp representative indicating Ms. Battle had inquired about
> a doctor visit.  Ms. Battle called and said she was waiting on a doctor appointment
> and would return after her visit.

(Ex. T to Def.'s Mot. for Summ. J.)  On or around January 8, 2008, OESC issued a determination

that Plaintiff "voluntarily quit her job for medical reasons," that she had "good cause connected to

the work" for leaving her employment, and that she was entitled to benefits effective December 16,

2007.  On January 21, 2008, Warn executed a form indicating that Plaintiff was "terminated"

effective January 8, 2008.  Also on January 21, 2008, Hamilton sent an email regarding "Margo's

termination."   On January 23, 2008, Heatherly completed a form specifying that the "type of

termination" was "resignation," as opposed to discharge or six other listed types of terminations.

On February 27, 2009, Plaintiff filed her Complaint in this case, asserting five claims for

relief: (1) racial discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII")

("race discrimination claim"); (2) racial discrimination in violation of 42 U.S.C. § 1981 ("§ 1981

claim"); (3) retaliatory discharge in violation of Title VII ("retaliatory discharge claim"); (4)

wrongful termination in violation of the Oklahoma Workers' Compensation Act ("OWCA"), Okla.

Stat. tit.  85, § 5 ("OWCA claim"); and (5) intentional infliction of emotional distress ("IIED

claim").

## II.  Summary Judgment Standard

Summary judgment is proper only if "there is no genuine issue as to any material fact, and

the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving

party bears the burden of showing that no genuine issue of material fact exists.  *See Zamora v. Elite

Logistics, Inc.*, 449 F.3d 1106, 1112 (10th Cir. 2006).  The Court resolves all factual disputes and

draws all reasonable inferences in favor of the non-moving party.  *Id*.  However, the party seeking

to overcome a motion for summary judgment may not "rest on mere allegations" in its complaint

but must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The party seeking to overcome a motion for summary judgment must also make a showing sufficient to establish the existence of those elements essential to that party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-33 (1986).

### III.   Race Discrimination Claim/§ 1981 Claim[6]

Plaintiff asserts four theories of racial discrimination: (1) failure to promote; (2) disparate discipline; (3) failure to train; and (4) discriminatory discharge. All four theories require different proof and will be analyzed separately.

#### A.   Failure to Promote

Plaintiff contends that JM Eagle failed to promote her to a first-shift lead position based on her race. In order to establish a prima facie failure to promote claim, a plaintiff must show: "(1) she was a member of a protected class; (2) she applied for and was qualified for the position; (3) despite being qualified she was rejected; and (4) after she was rejected, the position was filled by someone outside the protected class." *MacKenzie v. City and Cnty. of Denver*, 414 F.3d 1266, 1278 (10th Cir. 2005). If a plaintiff establishes a prima facie case, the defendant is then required to articulate a legitimate, nondiscriminatory reason for its failure to promote. *Id.* If the employer does so, "[t]his shifts the burden back to [the plaintiff] to proffer evidence demonstrating the employer's reason is pretextual." *Id.* "This is typically accomplished by revealing such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Id.* (internal quotations omitted).

---

[6] The race discrimination claim and §1981 claim require the same proof, *see Baca v. Sklar*, 398 F.3d 1210, 1218 n.3 (10th Cir. 2005), and will be addressed simultaneously.

JM Eagle contends that Plaintiff did not "request" a promotion to a first-shift lead position and that she therefore cannot satisfy the second prong of a prima facie case. (*See* Def.'s Mot. for Summ. J. 10; Reply in Support of Mot. for Summ. J. 9.)[7]   The Court rejects this argument.  It is undisputed that there was no formal application process and that the promotions at issue involved informal hiring procedures.  In cases involving informal hiring procedures, the proper test for the second element is whether the plaintiff was "in the group of people who might reasonably be interested in the particular job." *Bennett v. Quark, Inc.*, 258 F.3d 1220, 1228 (10th Cir. 2001), *overruled on other grounds as recognized in Boyer v. Cordant Techs., Inc.*, 316 F.3d 1137, 1140 (10th Cir. 2003).  As a member of the relevant department who worked the first shift, a jury could conclude that Plaintiff might reasonably have been interested in a promotion to the first-shift lead position, which involved a pay increase and increased responsibility.  Therefore, in the employment setting at issue, Plaintiff has created a question of fact as to whether Plaintiff "applied for" the first-shift lead positions that were ultimately filled by three white employees.  Plaintiff has therefore met her summary judgment burden as to her prima facie case.

JM Eagle offers two non-discriminatory reasons for its failure to promote Plaintiff to a first-shift lead position: (1) her failure to request such a promotion, and (2) her refusal to accept lead positions offered to her on the second and third shifts.  The Court has already determined that a formal request was not necessary in the employment setting at issue.  Further, JM Eagle has not presented any testimony as to what process was in fact used, what group of employees were actually considered, and what steps the promoted individuals took to "request" the promotions.  Under these

---

[7]   The record reflects that there was not a formal "application" process for promotions to lead positions.  Thus, JM Eagle couches its argument in terms of the lack of any verbal "request."

circumstances, Plaintiff has shown that there are weaknesses and implausibilities as to JM Eagle's first stated reason.

Plaintiff has also shown weaknesses and implausibilities as to the second stated reason – Plaintiff's refusal to accept promotions to lead positions on the second and third shifts. Plaintiff testified that she refused these positions because she had no child care during these shifts. At no time during her employment did Plaintiff work the second and third shifts. According to Plaintiff, JM Eagle was aware that she was unable to work the second or third shifts at that time, making such offers meaningless. Taken together, a jury could view these two stated reasons for failing to promote Plaintiff to a first-sift lead position as pretextual. Further, although JM Eagle has presented evidence that it promoted other African-Americans at various times, there is no dispute that the lead positions at issue were filled by white employees. While the promotion of African-Americans at later times may be relevant evidence negating any discriminatory animus, Plaintiff has presented sufficient evidence to present a jury question. Therefore, JM Eagle is not entitled to summary judgment on Plaintiff's failure to promote claim.

### B.      Disparate Discipline

"A prima facie case of disparate discipline may be established if the plaintiff proves by a preponderance of the evidence that (1) the plaintiff is a racial minority, (2) the plaintiff was disciplined by the employer, and (3) the employer imposed the discipline under circumstances giving rise to an inference of racial discrimination." *Jones v. Denver Post Corp.*, 203 F.3d 748, 753 (10th Cir. 2000). If a prima facie case is established, the Court must apply the burden-shifting analysis explained *supra* Part III.A.

Plaintiff's evidence does not create any triable question of fact as to the second element of her prima facie case – whether she was "disciplined" by JM Eagle at any time during her

employment.  Plaintiff admitted that she never received any written warnings, reprimands, or other forms of disciplinary action while employed by JM Eagle.  Plaintiff further admitted that she never suffered any loss of pay.  Plaintiff argues that she received a verbal warning of some sort when she made the Spring 2006 Complaint about smoke breaks.  However, Plaintiff has not shown that this warning effected any significant change in Plaintiff's employment status.  *See E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007) (written warning only constitutes an adverse employment action if it effects a significant change in the plaintiff's employment status).  Plaintiff also argues that certain white employees were *not* disciplined for taking long smoke breaks and for skipping a company training class.  While Plaintiff may have wanted these employees to be disciplined for their behavior, Plaintiff has not shown how JM Eagle's failure to discipline white employees somehow resulted in discriminatory discipline directed to Plaintiff.

Plaintiff further argues that she was subject to "discipline" by not being allowed to rotate off Metfit 1.  However, Plaintiff has not shown or presented any plausible argument that requiring Plaintiff to continue performing the duties of her modified position on Metfit 1 was somehow "discipline."  Assuming it could be construed as such, it is undisputed that African-American employees in the moldings department without medical restrictions were allowed to rotate.  Thus, Plaintiff cannot show that this "discipline" of refusing to allow her to rotate was imposed under any circumstances giving rise to an inference of race discrimination.

Finally, Plaintiff contends that JM Eagle required African-American employees, but not white employees, to get drug tested following a work-related injury.  Assuming this could somehow be construed as "discipline," Plaintiff concedes that she herself was not forced to undergo any drug testing following her workplace injuries.  Therefore, this is not an employment action to which Plaintiff was subject, and it cannot form the basis of her prima facie case.  *Woodland v. Joseph T.*

12

*Ryerson & Son, Inc.*, 302 F.3d 839, 844-45 (8th Cir. 2002) (minority plaintiff alleged to have suffered disparate treatment based on "more aggressive enforcement of drug testing") (affirming grant of summary judgment to defendant because the plaintiff had never incurred involuntary drug testing). Plaintiff cannot satisfy the second element of her prima facie case, and JM Eagle is entitled to judgment as a matter of law on Plaintiff's discriminatory discipline claim.

### C. Failure to Train

Title VII prohibits an employer controlling on-the-job training, retraining, or other training programs from discriminating against an individual because of her race. 42 U.S.C. § 2000e-2(d); *see Anderson v. Boeing Co.*, No. 02-CV-196, 2006 WL 2990383, at *18 (N.D. Okla. Oct. 18, 2006). To establish a prima facie case of discrimination for failure to train, Plaintiff must show that (1) she is a member of a protected group; (2) that JM Eagle provided training to its employees; (3) she was eligible for training; and (4) she was not provided training under circumstances giving rise to an inference of discrimination, *i.e.*, that she was denied training given to other similarly situated employees who were not members of the protected group. *See Singh v. Town of Mount Pleasant*, 172 Fed. Appx. 675, 682 (7th Cir. 2006) (citing *Pafford v. Herman*, 148 F.3d 658, 667 (7th Cir. 1998)). If a prima facie case is established, the Court must apply the burden-shifting analysis explained *supra* Part III.A.

Plaintiff cannot satisfy the fourth element of her prima facie case. Specifically, Plaintiff cannot demonstrate that the circumstances surrounding JM Eagle's decision to train Dunn, Annie Dunn, Carr, and Cadell – and not Plaintiff – on the CNC and/or SH-50 give rise to an inference of discrimination. JM Eagle has presented evidence that these four employees were selected because they were either leads, had experience on the relevant machines, or needed training on the machines due to an impending shift change. In contrast, Plaintiff had no experience on the machines at the

13

time the training began, was not a lead, and was not changing shifts or job duties.  Thus, Plaintiff

has not created a genuine question of fact as to whether she was similarly situated to those selected

for training.

Plaintiff has also not presented evidence demonstrating weaknesses or implausibilities in JM

Eagle's explanation that Plaintiff was not selected for the legitimate, non-discriminatory reason that,

in its business judgment, other employees better fit its selection criteria and were better situated to

benefit from the training.  Therefore, assuming Plaintiff could make a prima facie case, Plaintiff is

also unable to demonstrate that JM Eagle's proferred reasons for the failure to train – namely,

Plaintiff's failure to satisfy its selection criteria – is pretextual.  *Cf. Anderson*, 2006 WL 2990383,

at *19 (finding genuine issue of material fact as to whether the defendant's reason for denying

training was based on a neutral policy or was merely pretext for denying her training on the basis

of her sex, where reason given was "expense" but male counterparts nonetheless received training).[8]

### D.   Discriminatory Discharge

"A prima facie case of discriminatory discharge under Title VII requires plaintiff to

demonstrate that she (1) belongs to a protected class; (2) was qualified for her position; (3) was

discharged; and (4) her position was not eliminated after her discharge."  *Adamson v. Multi*

---

[8] JM Eagle also argues that Plaintiff cannot show that the lack of training affected her employment status or benefits.  The Court declines to reach this argument but observes that an effect on employment benefits or status appears to be an additional requirement.  *See Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 407 (5th Cir. 1999) (holding that plaintiff must show, at a minimum, that the failure to train tended to affect employment status or benefits); *Anderson*, 2006 WL 2990383, at *19-21 (holding that alleged failures to train were sufficient to constitute adverse employment actions where such failures could be viewed as resulting in fewer overtime hours and contributing to pay disparities between male and female employees).

*Community Diversified Services, Inc.*, 514 F.3d 1136, 1150 (10th Cir. 2008).  If a prima facie case is established, the Court must apply the burden-shifting analysis explained *supra* Part III.A.

JM Eagle first argues that Plaintiff cannot demonstrate the she was "discharged" and therefore cannot satisfy the third element of a prima facie case.  Viewing the evidence in a light most favorable to Plaintiff, a question of fact exists as to whether she was discharged or voluntarily resigned.  According to Plaintiff, Warn told her to leave the facility and that she needed to have her permanent restrictions lifted in order to rotate to the back table or any other area in the moldings department.  A jury could infer that Warn was allowing her to return to work only if she completed an impossible task – namely, having her permanent restrictions lifted.  After Plaintiff saw her own doctor and then informed Warn's secretary that, although her permanent restrictions were not lifted, she needed to return to work, Plaintiff was told not to return.  Plaintiff stopped receiving a paycheck.  According to Plaintiff, she begged to return to work on numerous occasions but was not allowed to do so.  Under these circumstances, a reasonable jury could conclude that Plaintiff was discharged.  *See Branham v. Thomas M. Cooley Law Sch.*, No. 1:07-CV-630, 2008 WL 5071700, at *13 (W.D. Mich. Nov. 24, 2008) (defendant argued that plaintiff "necessarily resigned her position when she declined to teach" a certain class; plaintiff argued that defendant discharged her by refusing to grant her request to teach a different class) (court held that question of whether the plaintiff "quit or was fired is really a question of fact analogous to a case of constructive discharge").[9]  Although JM Eagle places emphasis on OESC's determination that Plaintiff "voluntarily quit her job for medical reasons," the Court does not find this dispositive.  When Plaintiff applied for unemployment benefits, she stated that she had been discharged.  JM Eagle contended that she resigned, and this

---

[9] Plaintiff has not argued that she was constructively discharged, and the Court has not applied a constructive discharge analysis to the facts presented.

was a disputed issue in the unemployment benefit proceedings.  Therefore, the Court finds that JM

Eagle is not entitled to summary judgment based on Plaintiff's inability to satisfy the second element

of her prima facie case.

JM Eagle alternatively argues that, assuming Plaintiff was discharged, such discharge was

based on the non-discriminatory reason of Plaintiff's refusal to perform her assigned position on

Metfit 1 and the absence of any available alternative positions consistent with Plaintiff's permanent

restrictions.  The burden thus shifts to Plaintiff to demonstrate weaknesses or implausibilities in this

preferred reason that could lead a jury to conclude that the reason is a pretext for illegal

discrimination.

Plaintiff's pretext evidence consists of anecdotal accounts of JM Eagle allowing white

employees who suffered entirely different workplace injuries to be placed on "light duty" rather than

being terminated.  For example, Plaintiff testified that a white employee named Robert was moved

from the CNC and placed on light duty in quality control after he had rotator cuff surgery, that a

white employee broke her arm and was placed on light duty, and that this same employee was also

allowed to be on "light duty" while she was pregnant.  In contrast, Plaintiff testified that one

African-American, Tracy Foster, was terminated after suffering foot problems rather than being

allowed to continue working.[10]  The problem with Plaintiff's "pretext" evidence is that she has failed

to make an adequate showing that white employees were similarly situated to Plaintiff.  Unlike the

white employees placed on light duty following a temporary injury or condition, Plaintiff had

permanent restrictions.   JM Eagle created a position for Plaintiff that complied with these

---

[10]  In Plaintiff's brief, she argues that "Pam Ziegler, Ray Fisher, and Tracy Foster were all terminated and were not allowed to return to light duty."  (Pl.'s Resp. to Def.'s Mot. for Summ. J. 19 (citing Battle Dep. at 228:8-22).)  The Court has reviewed Plaintiff's deposition at length and does not believe this statement is supported by the record.

restrictions.  When Plaintiff could no longer perform the duties of this created position, JM Eagle and Plaintiff reached an impasse, and JM Eagle was unwilling to allow her to rotate to the back table as requested, unless and until her restrictions were lifted.  Evidence regarding how JM Eagle handled temporary disabilities of white employees does not tend to cast doubt on the proferred reason given in this case – that Plaintiff would not or could not perform the position JM Eagle created to accommodate her permanent restrictions.

The 10/23/07 incident also does not demonstrate pretext.  This exchange with Heatherly, although heated, did not involve any racial remarks or any other circumstances tending to show racial animus.  Plaintiff has presented evidence of racial remarks by Boyer, Dunn, and Peck. However, these individuals were not involved in the alleged termination decision, and such remarks occurred well in advance of such decision.  Further, following these alleged racist remarks, Plaintiff received various raises and what she perceived as a promotion to the quality control department. Due to the lack of temporal proximity and the lack of connection to Warn or other individuals making the termination decision, the Court finds that these racial remarks do not tend to demonstrate pretext.

Finally, Plaintiff contends that pretext is shown because JM Eagle allowed her to work at the back table at times when Metifit 1 was down.  However, JM Eagle's allowing Plaintiff to work at the back table on an occasional basis when Metifit 1 was being repaired is quite different than allowing Plaintiff to work there for an entire shift or allowing Plaintiff to regularly rotate to the back table.  Plaintiff told her supervisors that she could not operate Metifit 1 due to pain in her left side. The fact that JM Eagle had previously allowed her to occasionally work at the back table does not cast doubt on JM Eagle's subsequent business decisions that (1) rotation was not possible unless

Plaintiff's permanent restrictions on her right arm were lifted, and (2) the modified position in the moldings department was not going to work due to Plaintiff's complaints about her left side.

In sum, Plaintiff has not shown any weaknesses or implausibilities in the reason given for JM Eagle's employment decision. Whether such decision is deemed a termination or some type of forced resignation, there is no evidence that Plaintiff was treated differently than similarly situated white employees who had permanent restrictions similar to Plaintiff's or that JM Eagle somehow failed to accommodate her in a way that it accommodated white employees. Plaintiff admits that she could not perform Metfit 1 duties. It is not this Court's role to second-guess JM Eagle's business decision that Metfit 1 was the only available position for Plaintiff; it is the Court's role to determine if Plaintiff has created a jury question exists as to the question of racial discrimination. The Court finds that Plaintiff has not done so. Therefore, JM Eagle is entitled to summary judgment on Plaintiff's discriminatory discharge claim based on Plaintiff's inability to demonstrate pretext as to the reason given for Plaintiff's alleged termination.

## IV.    Retaliatory Discharge Claim

To state a prima facie case of retaliation, a plaintiff must demonstrate that: (1) she engaged in protected opposition to discrimination; (2) the defendant took an adverse employment action against her; and (3) there exists a causal connection between the protected activity and the adverse action. *Stover v. Martinez*, 382 F.3d 1064, 1071 (10th Cir. 2004). If a prima facie case is established, the Court must apply the burden-shifting analysis explained *supra* Part III.A.

JM Eagle challenges the second element. For reasons explained *supra* Part III.D, there exists a question of fact as to whether JM Eagle took an adverse employment action against Plaintiff, and JM Eagle is not entitled to summary judgment based on Plaintiff's inability to establish the second element.

JM Eagle also challenges the third element of the prima facie case – the existence of a causal connection between any of Plaintiff's alleged complaints and the alleged termination.  "[A] causal connection may be established by proffering evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action."  *See id.* (internal quotations omitted).  The Court concludes that Plaintiff cannot demonstrate the third element of her prima facie case.  The three instances of protected activity – the Spring 2006 Complaint, the Fall 2006 Complaint, and the January 2007 Complaint[11] – are too remote in time to be causally connected to the alleged termination occurring in December 2007.  Further, only one such complaint was made to Warn, the decision maker involved in the termination decision.  These complaints occurred while Plaintiff worked in different departments and prior to her work-related injury that ultimately led to her being placed in the Metfit 1 position.   In the time between Plaintiff's complaints of discrimination, she received various raises and a promotion to the quality control department.  JM Eagle also created a position for her in the moldings department following her surgery on her right arm.  Plaintiff has presented no evidence of circumstances that justify an inference that Plaintiff's termination was motivated by her prior complaints of racial discrimination.

Even assuming Plaintiff could establish the third element, the Court also concludes, for reasons explained *supra* Part III.D, that Plaintiff has not presented evidence demonstrating that the reason given for the termination decision was pretextual.   Accordingly, JM Eagle is entitled to summary judgment on Plaintiff's claim for retaliatory discharge.

---

[11]  Plaintiff did not complain of racial discrimination during the October 2007 Complaint. Thus, while closer in time, this complaint cannot constitute protected opposition to discrimination.

**V.      OWCA Retaliatory Discharge Claim**

Plaintiff alleges that she was discharged in retaliation for filing a workers' compensation claim.  Oklahoma's workers' compensation law provides that no employer may discharge an employee because the employee has in good faith filed a workers' compensation claim.  Okla. Stat. tit. 85, § 5(A)(1).  However, the OWCA also provides:

> After an employee's period of temporary total disability has ended, no person, firm, partnership, corporation, or other entity shall be required to rehire or retain any employee who is determined to be physically unable to perform assigned duties. The failure of an employer to rehire or retain any such employee shall in no manner be deemed a violation of this section.

*Id.* § 5(C).

In order to establish a prima facie case for this type of retaliatory discharge, Plaintiff must show: (1) employment with JM Eagle; (2) on the job injury, (3) receipt of treatment under circumstances which put the employer on notice that treatment had been rendered for a work-related injury or that the employee instituted proceedings under the act; and (4) consequent termination of employment. *Buckner v. Gen. Motors Corp.*, 760 P.2d 803, 806 (Okla. 1988).  "After a prima facie case is established, the burden then appropriately shifts to the employer to rebut the inference that its motives were retaliatory by articulating that the discharge was for a legitimate non-retaliatory reason for the discharge."  *Id.*  One such reason includes the "inability to perform the assigned duties."  *Id.* at 807.  If the employer satisfies this burden of production, "the employee bears the burden of persuasion that the reason given for termination was pretextual." *Id.*  "This burden merges with the ultimate burden of persuading the court that she has been the victim of retaliatory discharge."  *Id.*  "The employee may succeed in this, either directly by persuading the court that the discharge was significantly motivated by retaliation for her exercise of statutory rights, or indirectly by showing that the employer's proffered explanation is unworthy of credence."  *Id.*

20

JM Eagle challenges the fourth element of Plaintiff's prima facie case. For reasons explained *supra* Part III.D, there exists a question of fact as to whether JM Eagle terminated Plaintiff, and JM Eagle is not entitled to summary judgment based on Plaintiff's inability to establish the fourth element.

JM Eagle also challenges Plaintiff's ability to demonstrate that its proferred reason for termination – her inability to perform the assigned duties on Metfit 1 and the lack of other available positions – is pretextual. Plaintiff has not presented any evidence tending to show that JM Eagle's proferred reason is unworthy of credence. The Court finds it important that JM Eagle modified a position in the moldings department to accommodate Plaintiff's permanent restrictions – following her workers' compensation claim, her surgery, and her absence from employment – despite any legal obligation to do so. This fact tends to negate any retaliatory motive based on Plaintiff's filing of a worker's compensation claim. Even construed favorably to Plaintiff, the facts demonstrate (1) an attempted accommodation that simply did not work because it caused another injury, (2) a refusal to accede to Plaintiff's requested modification of the already modified position, and (3) a subsequent termination. This sequence of events belies any notion that JM Eagle was motivated by Plaintiff's filing her workers' compensation claim regarding her right arm. To the contrary, JM Eagle attempted, albeit unsuccessfully, to maintain Plaintiff's employment despite her workers' compensation claim and permanent restrictions.

Plaintiff testified that, in her opinion, numerous other positions were available at JM Eagle within her permanent restrictions. Plaintiff also testified that, in her opinion, she could have continued to work on Metfit 1 if allowed to rotate to the back table. Even if true, it is undisputed that Plaintiff could not perform the duties she was assigned – operation of Metfit 1 for an entire shift – following her return to work. As argued by JM Eagle, it had no duty to create this position and

21

certainly had no duty to modify the created position or consider other positions at Plaintiff's request. Plaintiff also argues that Warn refusing to allow her to rotate prior to her termination evidences retaliatory motive.  However, the position was modified for Plaintiff to expressly prevent rotation, since Warn believed Plaintiff could not complete the other rotations within her restrictions.  Thus, Warn's refusal to allow rotation is entirely consistent with his proffered reason for termination and does not evidence pretext.  For these reasons and other reasons explained *supra* Part III.D, the Court finds that Plaintiff has not presented sufficient evidence of pretext.  Accordingly, JM Eagle is entitled to summary judgment on Plaintiff's claim for OWCA retaliatory discharge.

## VI.    IIED Claim

In order to succeed on a claim of intentional infliction of emotional distress, a plaintiff must show: (1) the defendant's conduct was intentional or reckless; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff to suffer emotional distress; and (4) the plaintiff's emotional distress was severe.  *Daemi v. Church's Fried Chicken, Inc.,* 931 F.2d 1379, 1387 (10th Cir. 1991).  To satisfy the extreme and outrageous element, a plaintiff must prove the defendant's conduct was so extreme and outrageous as to be beyond all possible bounds of decency.  *Eddy v. Brown*, 715 P.2d 74, 77 (Okla. 1986) ("Conduct which, though unreasonable, is neither beyond all possible bounds of decency in the setting in which it occurred, nor is one that can be regarded as utterly intolerable in a civilized community, falls short of having actionable quality.") (quotations omitted).  In evaluating the outrageousness of certain conduct, courts must consider the setting in which the conduct occurred, *id.*, and Oklahoma law explicitly does not extend liability "to mere insults, indignities, threats, . . . [or] occasional acts that are definitely inconsiderate and unkind."  *Eddy*, 715 P.2d at 77 (quotation omitted).  Finally, Oklahoma law directs the district court to act as a gatekeeper and make an initial determination about the validity of a claim before

sending it to the jury. *Breeden v. League Servs. Corp.*, 575 P.2d 1374, 1377-78 (Okla. 1978) ("The court, in the first instance, must determine whether the defendant's conduct may reasonably be regarded so extreme and outrageous as to permit recovery . . . .").

Even considered in the light most favorable to Plaintiff, Plaintiff's evidence is insufficient to satisfy the second element requiring extreme and outrageous conduct. Considered individually and collectively, nothing that occurred during Plaintiff's employment with JM Eagle can be considered extreme and outrageous conduct. Plaintiff argues that she suffered racial slurs and jokes. The Court has considered the nature and extent of these incidents and finds them insufficient to support a claim under Oklahoma law. *See Eddy*, 715 P.2d 74 (multiple instances of ridicule and harassment of employee found insufficient to support IIED claim); *Miner v. Mid-Am. Door Co.*, 68 P.3d 212 (Okla. Ct. App. 2002) (coemployee's verbal abuse regarding employee's sexuality and physical threats found insufficient to support IIED claim); *Mirzaie v. Smith Cogeneration, Inc.*, 962 P.2d 678 (Okla. Ct. App. 1998) (employer making harassing phone calls to plaintiff in the middle of the night, requiring him to do unnecessary work, and making derogatory sexual comments about the plaintiff's fiancee found insufficient to support IIED claim); *Anderson v. Okla. Temp. Servs., Inc.*, 925 P.2d 574 (Okla. Ct. App. 1996) (former supervisor's conduct in describing how sexual favors could be used to obtain business, discussing former employee's faults with another employee, making lewd remarks about former employee, leaving door open to restroom and coming out with her skirt up to waist, opening her blouse to show bra to co-workers and commenting on her sex life with her husband within hearing distance of employees found insufficient to support IIED claim). The conduct alleged by Plaintiff, while clearly inappropriate workplace conduct, simply does not rise to the level of being so extreme and outrageous so as "beyond all possible bounds of decency." *Eddy*, 715 P.2d at 77 (internal citation omitted).

23

Plaintiff also complains that "Warn intentionally refused to rotate [her] off of the Metfit machine while rotating all of her coworkers, ultimately creating such a severe environment due to the strenuous and repetitive nature of working the machine." (Pl.'s Resp. to Def.'s Mot. for Summ. J. 23.) This argument ignores the context of the employment situation. Warn "intentionally refused to rotate her" because he modified the moldings department position, which would normally involve rotation, in an attempt to accommodate Plaintiff's permanent restrictions. Even assuming this was poor bad business decision in light of Plaintiff's resulting injuries to her left side, there is nothing "extreme or outrageous" about JM Eagle's conduct during Plaintiff's employment or at the time of her termination.

## VII.   Conclusion

For the reasons stated herein, Defendant's Motion for Summary Judgment (Doc. 38) is GRANTED IN PART and DENIED IN PART.  It is DENIED as to Plaintiff's claim for discriminatory failure to promote and GRANTED as to all other claims.  Defendant is ordered to file a Notice to the Court, specifying what aspects of its motion in limine (Doc. 43), if any, are moot in light of this Order.  Defendant shall file such notice no later than January 6, 2011.  The parties shall submit a Pretrial Order consistent with this Order no later than January 7, 2011, and the January 5, 2011 deadline (*see* Doc. 52) is STRICKEN.

**IT IS SO ORDERED this 5th day of January, 2011.**

**TERENCE C. KERN**
**UNITED STATES DISTRICT JUDGE**

24